Slip Op. 21-124

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **GOVERNMENT OF ARGENTINA,**<br><br>                    **Plaintiff,**<br><br>          **and**<br><br>**LDC ARGENTINA, S.A.,**<br><br>                         **Consolidated Plaintiff,**<br><br>     **v.**<br><br>**UNITED STATES,**<br><br>                    **Defendant,**<br><br>          **and**<br><br>**NATIONAL BIODIESEL BOARD FAIR TRADE COALITION,**<br><br>                    **Defendant-Intervenor.** | **Before: Gary S. Katzmann, Judge**<br>**Consol. Court No. 20-00119** |

## <u>OPINION</u>

[The court denies Plaintiffs' motion for judgment on the agency record and sustains Commerce's <u>Final Results</u>.]

Dated:  <u>September 21, 2021</u>

<u>Frank H. Morgan</u>, Trade Law Defense PLLC, of Alexandria, VA, argued for Plaintiff Government of Argentina.

<u>Jessica E. Lynd</u>, White & Case, LLP, of Washington, D.C., argued for Consolidated Plaintiff LDC Argentina, S.A.  With them on the joint brief was <u>Gregory J. Spak</u>.

<u>Joshua E. Kurland</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States.  With him on the brief were <u>Brian M. Boyton</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>L. Misha Preheim</u>, Assistant Director.  Of Counsel <u>Ayat Mujais</u>, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance.

<u>Myles S. Getlan</u>, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for Defendant-Intervenor National Biodiesel Board Fair Trade Coalition.  With him on the brief were <u>Jack A. Levy</u>, <u>Thomas M. Beline</u>, and <u>Chase J. Dunn</u>.

Katzmann, Judge:   This case involves a challenge to the Department of Commerce's ("Commerce") changed circumstances review ("CCR") of the countervailing duty ("CVD") order for biodiesel from Argentina.  Plaintiff the Government of Argentina ("GOA") and Consolidated Plaintiff LDC Argentina S.A. ("LDC"), a processor and exporter of biodiesel from Argentina, (collectively, "Plaintiffs"), bring this action against the United States ("the Government") to appeal Commerce's Biodiesel from Argentina: Final Results of Countervailing Duty Changed Circumstances Review, 85 Fed. Reg. 27,987 (Dep't Commerce May 12, 2020) ("Final Results"). Specifically, Plaintiffs argue that Commerce's Final Results were: (1) not in accordance with law because they applied an impermissible statutory framework; (2) supported by speculation rather than substantial evidence; and (3) unlawfully issued after the regulatory deadline.  Joint Mem. of Points and Auths. in Supp. of Pl.'s and Consol. Pl.'s Rule 56.2 Mot. for J. Upon the Agency R., Dec. 7, 2020, ECF No. 24 ("Pls.' Br.").  The Government and Defendant-Intervenor the National Biodiesel Board Fair Trade Coalition ("NBB") oppose Plaintiffs' claims.  Def.'s Resp. to Pls.' Rule 56.2 Mot. For J. Upon the Agency R., ECF No. 26, Feb. 22, 2021 ("Def.'s Br."); Def.-Inter. Nat'l Biodiesel Bd. Fair Trade Coal.'s Resp. to Pl.'s Rule 56.2 Mot. for J. on the Agency R., Feb. 22, 2021, ECF No. 25 ("Def.-Inter.'s Br.").  The court denies Plaintiffs' motion for judgment on the agency record and sustains Commerce's Final Results.

## BACKGROUND

### I.    *Legal & Regulatory Framework*

To empower Commerce to offset economic distortions caused by countervailable subsidies and dumping, Congress promulgated the Tariff Act of 1930.  Sioux Honey Ass'n v. Hartford Fire Ins., 672 F.3d 1041, 1046–47 (Fed. Cir. 2012); ATC Tires Priv. Ltd. v. United States, 42 CIT __, __, 322 F. Supp. 3d 1365, 1366 (2018).  That Act, "as amended, allows Commerce to impose . . .

duties on imports that injure domestic industries." Guangdong Wireking Housewares & Hardware Co. v. United States, 745 F.3d 1194, 1196 (Fed. Cir. 2014). "Under the Tariff Act's framework, Commerce may -- either upon petition by a domestic producer or of its own initiative -- begin an investigation into potential countervailable subsidies and, if appropriate, issue orders imposing duties on the subject merchandise." ATC Tires, 322 F. Supp. 3d at 1366–67; see also 19 U.S.C. §§ 1671, 1673; Sioux Honey, 672 F.3d at 1046–47. A subsidy is countervailable if the following elements are satisfied: (1) a government or public authority has provided a financial contribution; (2) a benefit is thereby conferred upon the recipient of the financial contribution; and (3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries. 19 U.S.C. § 1677(5). If Commerce determines that the government of another country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, sold, or likely to be sold for import, into the United States, and the International Trade Commission ("ITC") determines that an industry in the United States is materially injured or threatened with material injury thereby, then Commerce shall impose CVDs upon such merchandise equal to the amount of the net countervailable subsidy. See 19 U.S.C. § 1671(a).

Usually, antidumping ("AD") and CVD orders undergo periodic administrative review pursuant to 19 U.S.C. § 1675(a). CCRs, on the other hand, are authorized by 19 U.S.C. § 1675(b) and occur when Commerce "receives information concerning, or a request from an interested party for a review of . . . a final affirmative determination" that "shows changed circumstances sufficient to warrant a review of such determination." 19 U.S.C. § 1675(b)(1). Under Commerce's implementing regulation, "[a]n interested party may request a changed circumstances review . . . of an order" and the Secretary "will determine whether to initiate a changed circumstances review"

within forty-five days after such a request is filed.  19 C.F.R. § 351.216(b).  "Unless the Secretary

finds that good cause exists, the Secretary will not review a final determination in an investigation

. . . less than 24 months after the date of publication of notice of the final determination."  19

C.F.R. § 351.216(c).  On the other hand, "if the Secretary decides that changed circumstances

sufficient to warrant a review exist, the Secretary will conduct a changed circumstances review."

19 C.F.R. § 351.216(d).

     A changed circumstances review is conducted in accordance with 19 C.F.R. § 351.221.  Id.

Procedurally, that regulation provides that "after receipt of a timely request for a review, or on the

Secretary's own initiative when appropriate, the Secretary will:" (1) publish the notice of review

initiation in the Federal Register; (2) send questionnaires requesting factual information to

appropriate interest parties; (3) conduct a verification if appropriate; (4) issue a preliminary

determination and publish the notice of the preliminary determination in the Federal Register,

including rates determined and an invitation for argument; (5) issue a final determination and

publish the notice of the final decision in the Federal Register; and (6) instruct the Customs Service

to collect cash deposits at the revised rates on future entries, if cash deposit rates were revised.  19

C.F.R. § 351.221(b).  The final decision in a changed circumstances review must be issued "within

270 days after the date on which the changed circumstances review is initiated, or within 45 days

if all parties to the proceeding agree to the outcome of the review."  19 C.F.R. § 351.216(e).

Substantively, "a CCR may address a broad range of matters and the only limitation in the statute

is the requirement that there be changed circumstances sufficient to warrant a review."  Marsan

Gida Sanayi Ve Ticaret A.S. v. United States, 35 CIT 222, 228 (2011) ("Marsan Gida"); see also

Or. Steel Mills Inc. v. United States, 862 F.2d 1541, 1543–44 (Fed. Cir. 1988).

## II.      Factual and Procedural History

### A.      The Underlying CVD Investigation

On April 12, 2017, Commerce initiated a CVD investigation into imports of biodiesel from Argentina and Indonesia, based on a petition filed by NBB.  Biodiesel from Argentina and Indonesia: Initiation of Countervailing Duty Investigations, 82 Fed Reg. 18,423, 18,424 (Dep't Commerce Apr. 19, 2017).  During this investigation, Commerce selected LDC as a mandatory respondent, as well as its affiliate Louis Dreyfus Claypool.[1]  See Biodiesel from the Republic of Argentina: Final Affirmative Countervailing Duty Determination, 82 Fed. Reg. 53,477 (Dep't Commerce Nov. 16, 2017).  On November 16, 2017, Commerce published its final determination in the CVD investigation.  Id.  Commerce concluded that the GOA's export tax on soybeans, which

---

[1] In CVD investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f-1(e)(2), which provides:

> If the administering authority determines that it is not practicable to determine individual countervailable subsidy rates under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may—
>
> > (A) determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to—
> >
> > > (i) a sample of exporters or producers that the administering authority determines is statistically valid based on the information available to the administering authority at the time of selection, or
> > >
> > > (ii) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the administering authority determines can be reasonably examined; or
> >
> > (B) determine a single country-wide subsidy rate to be applied to all exporters and producers.
>
> The individual countervailable subsidy rates determined under subparagraph (A) shall be used to determine the all-others rate under section 1671d(c)(5) of this title.

was thirty percent higher than the export tax on biodiesel, was designed to benefit biodiesel producers, since soybeans are the primary input for biodiesel.  Mem. from G. Taverman to J. Maeder "Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Biodiesel from the Republic of Argentina 25–28 (Dep't Commerce Nov. 6, 2017).  Consequently, Commerce determined that LDC was the beneficiary of a subsidy program and received soybeans for less-than-adequate remuneration ("LTAR") due to export taxes.  Id.  On January 4, 2018, Commerce published its CVD Order, setting the duty rate for biodiesel from Argentina at 72.28%.  Biodiesel from the Republic of Argentina and the Republic of Indonesia: Countervailing Duty Orders, 83 Fed. Reg. 522 (Dep't Commerce Jan. 4, 2018).[2]

### B.     The CCR Investigation

On September 21, 2018, the GOA petitioned Commerce to undertake a CCR of the CVD Order.  GOA's Letter re Biodiesel from Argentina: Request for Changed Circumstances Review (Sept. 21, 2018), P.R. 1.  The GOA wanted Commerce to adjust the cash deposit rates on biodiesel to reflect purported changes in Argentina's export tax regime.  Id.  On November 13, 2018, Commerce initiated a CCR of the CVD Order.  See Biodiesel from Argentina: Initiation of Changed Circumstances Reviews of the Antidumping and Countervailing Duty Orders, 83 Fed. Reg. 56,300 (Dep't Commerce Nov. 13, 2018) ("CCR Initiation").  On July 9, 2019, Commerce issued preliminary results in the CCR, stating that it had found changed circumstances warranting calculation of a new cash deposit rate.  Biodiesel from Argentina: Preliminary Results of Changed Circumstances Reviews of the Antidumping and Countervailing Duty Orders, 84 Fed. Reg. 32,714, 32,719 (Dep't Commerce July 9, 2019) ("Preliminary Results").  In particular, Commerce found

---

[2] A clerical error correction was issued on January 23, 2018.  Biodiesel from the Republic of Argentina and the Republic of Indonesia: Countervailing Duty Orders, 83 Fed. Reg. 3,114 (Dep't Commerce Jan. 23, 2018).

that Argentine export taxes on soybeans and biodiesel had converged since the original investigation, demonstrating that the GOA was no longer using these export taxes to encourage development of the Argentine biodiesel industry.  Id. at 32,718–19.  Commerce preliminarily determined that the CVD rate for biodiesel should be decreased from 72.28% to 0.19%.  Id. at 32,719.

On July 12, 2019, NBB and LDC submitted additional factual information as interested parties.  See Issues and Decisions Mem. For the Final Results of the Changed Circumstances Review of the Countervailing Duty Order: Biodiesel from Argentina 2 (May. 5, 2020), P.R. 128 ("IDM").  On August 26, 2019, at the request of NBB, Commerce conducted a verification of the GOA in connection with the CCR and successfully verified the accuracy and completeness of the information the GOA had provided.  NBB's Letter re Biodiesel from Argentina: Petitioner's Request for Verification (July 29, 2019), P.R. 66; Mem. from M. Hoadley to File re Changed Circumstances Review of the Countervailing Duty Order on Biodiesel from Argentina; Verification of Information Submitted by the Government of Argentina (Sept. 5, 2019), P.R. 81.  In the following months, Commerce and interested parties placed additional factual information on the record to reflect continuing changes to the GOA's export tax regime and the biodiesel market.[3]  First, on October 16, 2019, Commerce placed additional factual information on the record regarding current biodiesel prices.  IDM at 3.  On October 24, 2019, NBB placed additional factual information on the record regarding the biodiesel market.  Id.  On December 17, 2019, Commerce placed additional factual information on the record regarding tax regime changes, in

---

[3] Between issuing the Preliminary Determination and the Final Determination, Commerce had several meetings with the interested parties.  Pls.' Br. at 7.  During this time, Commerce also discussed the CCR with Governor Reynolds, Congressman LaHood, Senator Alexander and Senator Grassley via email and during ex parte discussions.  Id. at 7–8 (setting forth record citations).

the form of a decree made by the newly elected president of Argentina, Alberto Fernandez. Id. The GOA and NBB then submitted additional information and comments in response. Id. at 4. On March 11, 2020, Commerce placed additional factual information on the record regarding another decree issued by the GOA concerning export taxes, upon which the parties also commented. Id. At the end of Commerce's CCR investigation, the record showed that, between December 17, 2019, and March 11, 2020, the GOA increased the export tax on soybeans from roughly twenty-five to thirty-three percent due to multiple changes to the GOA's export tax regime. Id. at 5–6.

Of further relevance to Plaintiffs' challenge is the timeline and extensions of Commerce's investigation. After initiating the CCR in November 2018, on January 28, 2019, Commerce tolled all deadlines affected by a partial government shutdown. Mem. from G. Taverman to Record re Deadlines Affected by the Partial Shutdown of the Fed. Gov't (Jan. 28, 2019), P.R. 20. Subsequently, on August 2, 2019, Commerce placed a thirty-four day hold on the deadlines relevant to this specific case. Mem. from C. Baskin-Gerwitz to File re Changed Circumstances Reviews of the Antidumping and Countervailing Duty Orders on Biodiesel from Argentina: Holding of Deadlines (Aug. 2, 2019), P.R. 69. Commerce reinstated the deadlines for the case on September 5, 2019. Mem. from C. Baskin-Gerwitz to File re Changed Circumstances Reviews of the Antidumping and Countervailing Duty Orders on Biodiesel from Argentina: Publ'n of Verification Rep. and Reinstatement of Deadlines (Sept. 5, 2019), P.R. 79. On September 11, 2019, NBB requested an indefinite suspension of the deadlines for briefs and the final decision. NBB's Letter re Biodiesel from Argentina: Request for Meeting and Extension of Briefing Schedule (Sept. 11, 2019), P.R. 82. On the same day, NBB requested that Commerce accept additional factual information. IDM at 3. The next day, the GOA responded, stating that a brief

extension of deadlines was acceptable, and Commerce issued a short extension of the deadlines. Id.

On May 12, 2020, Commerce issued its final results of the CCR.   See generally Final Results; IDM.  The Final Results concluded that there were not changed circumstances sufficient to warrant a recalculation of the cash deposit rate for biodiesel.  85 Fed. Reg. at 27,989.  Commerce issued its Final Results 546 days after initiating the CCR, 294 days past the regulatory deadline for CCR determinations.  See CCR Initiation; Final Results; 19 C.F.R. § 351.216(e).

### C.   Procedural History of the Litigation

The GOA initiated this litigation on June 11, 2020, and filed its complaint on July 10, 2020. Summons, ECF No. 1; Compl., ECF No. 9.  LDC initiated a similar challenge on June 11, 2020, and filed its complaint on July 10, 2020.  LDC's Summons, LDC Argentina S.A. v. United States, No. 20-119, June 11, 2020, ECF No. 1; LDC's Compl., LDC Argentina S.A. v. United States, No. 20-119, July 10, 2020, ECF No. 10.  On August 13, 2020, the court granted a consent motion to consolidate the two cases, and LDC was added as a Consolidated Plaintiff to this action.  Consol. Order, Aug. 13, 2020, ECF No. 17.  On December 7, 2020, Plaintiffs filed a joint motion for judgment on the agency record, arguing that Commerce's Final Results were not supported by substantial evidence, otherwise not in accordance with law, and untimely decided.  Pls.' Br. at 1– 3, 15–17.  The Government and NBB filed response briefs to Plaintiffs' motion on February 22, 2021.  Def.'s Br., ; Def.-Inter.'s Br.  Plaintiffs filed their joint reply brief on March 22, 2021.  Joint Reply in Supp. Of Pl.'s and Consol. Pl.'s Rule 56.2 Mot. For J. Upon the Agency R., Mar. 22, 2021, ECF No. 27 ("Pls.' Reply Br.").  Oral argument was held on July 8, 2021.  Oral Arg., ECF No. 37.  Prior to oral argument, the court issued and the parties responded to questions regarding the case.  Ct.'s Letter re: Questions for Oral Arg., June 24, 2021, ECF No. 32; Joint Resp. to Oral

Arg. Questions Addressed to Pl. and Consol. Pl., July 2, 2021, ECF No. 34 ("Pls.' Resp. to Oral

Arg. Questions"); Def.'s Resp. to Ct.'s June 24, 2021 Questions for Oral Arg., July 2, 2021, ECF

No. 35 ("Def.'s Resp. to Oral Arg. Questions"); Def.-Inter Nat'l Biodiesel Bd. Fair Trade Coal.'s

Response to the Ct.'s Questions in Advance of Oral Arg., July 2, 2021, ECF No. 33.  As directed

by the court, the parties also filed briefs following oral argument.  Pl. and Consol.-Pl.'s Joint Post-

Arg. Submission, July 15, 2021, ECF No. 39; Def.'s Suppl. Submission, July 15, 2021, ECF No.

40; Def.-Inter. Nat'l Biodiesel Bd. Fair Trade Coal.'s Suppl. Comments Following Oral Arg., July

15, 2021, ECF No. 38.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C.

§ 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(ii).  The standard of review in this action is set forth in 19

U.S.C. § 1516a(b)(l)(B)(i): "[t]he court shall hold unlawful any determination, finding or

conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in

accordance with law."  Substantial evidence is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229

(1938).  "That there is a possibility of drawing two inconsistent conclusions from the evidence

does not preclude the agency's finding from being supported by substantial evidence."  Haixing

Jingmei Chem. Prod. Sales Co. v. United States, 42 CIT __, __, 335 F. Supp. 3d 1330, 1346 (2018)

(citation omitted).

## DISCUSSION

Plaintiffs argue that: (1) the Final Results were not in accordance with law or the applicable

statutes; (2) Commerce's determination that Argentina's export tax regime was in flux was not

supported by substantial evidence; and (3) Commerce's Final Results were unlawfully issued after

the regulatory deadline.  Pls.' Br. at 9–21; Pls.' Reply Br. at 3–13.  The Government and NBB

respond that: (1) Commerce conducted the CCR within its broad discretion; (2) substantial record

evidence supports the conclusion that Argentina's export tax regime was in flux; and (3) Plaintiffs

failed to exhaust their administrative remedies regarding timeliness, and the timeliness claim is

otherwise meritless.  Def.'s Br. at 6–25; Def.-Inter.'s Br. at 12–30.  The court concludes that

Commerce's interpretation of the CCR statute was reasonable, that the <u>Final Results</u> were

supported by substantial evidence, and that Plaintiffs failed to exhaust administrative remedies

regarding timeliness of the decision.  The court denies Plaintiffs' motion for judgment on the

agency record and sustains Commerce's <u>Final Results</u>.

### I.   *Commerce Conducted the CCR in Accordance with Law.*

Plaintiffs argue that Commerce applied the incorrect statutory analysis in its CCR.  Pl.'s

Br. at 13.  Plaintiffs acknowledge that Commerce correctly initiated the CCR pursuant to 19 U.S.C.

§ 1675(b) but contend that Commerce improperly revisited its initiation decision in the <u>Final</u>

<u>Results,</u> rather than performing an analysis of countervailability under 19 U.S.C. § 1677(5)(B)(iii),

(D)(iii) and (E)(iv), as it did in its <u>Preliminary Determination</u>.  <u>Id.</u> at 11, 13.  The Government

argues that Commerce reconsidered its initial decision and ultimately concluded that there were

not sufficient changed circumstances under 19 U.S.C. § 1675(b), upon which it could accurately

review the underlying CVD Order or adjust the cash deposit rates.  Def.'s Br. at 13–14.  The

Government argues that Commerce thus reasonably determined that it did not need to make a

further determination about whether there was a countervailable subsidy under 19 U.S.C. §

1677(5).  <u>Id.</u>  Similarly, NBB argues that Commerce is not required by statute to undertake any

particular analysis during a CCR.  Def.-Inter.'s Br. at 22 (citing <u>Marsan Gida</u>, 35 CIT at 228).

NBB notes that Commerce is given significant discretion in conducting CCRs, and that in the past,

Commerce has refrained from changing cash deposit rates or re-analyzing countervailability except under extremely narrow circumstances where it has found "clear cut and discrete" changes to subsidy programs.  Id.

Throughout the CCR investigation, Commerce relied upon both the CCR provision, 19 U.S.C. § 1675(b), and the CVD provision, 19 U.S.C. § 1677(5), of the Tariff Act of 1930 to conduct its analysis.  Upon initiating the CCR, Commerce noted that "pursuant to section 751(b)(1) of the Tariff Act of 1930, as amended (the Act), and 19 CFR § 351.216(d), Commerce will conduct a CCR" of the CVD determination.  CCR Initiation, 83 Fed. Reg. at 56,301.  Specifically, Commerce noted that although "[it] may not conduct a CCR of an investigation within 24 months of the date of the investigation determination in absence of 'good cause'" pursuant to 19 U.S.C. § 1675(b)(4), the GOA had provided information indicating changes to Argentina's export tax regime.  Id.  Commerce concluded that there was good cause to initiate a CCR pursuant to 19 U.S.C. § 1675(b)(1), (4) and 19 C.F.R. § 351.216.  Id. at 56,301–02.

In the Preliminary Results, Commerce explained that the purpose of its CCR was "not to reconsider the validity of the determinations made in the AD or CVD investigations . . . [but] to consider whether circumstances have changed since the end of the POIs such that the cash deposit rates established by the final determinations . . . are no longer the best estimates for prospective dumping and subsidization and are therefore no longer appropriate for purposes of collecting deposits." 84 Fed. Reg. at 32,716.  Commerce preliminarily concluded that, pursuant to 19 U.S.C. § 1675(b) and 19 C.F.R. § 351.216, there were changed circumstances warranting recalculation of the CVD cash deposit rates and preliminarily calculated revised cash deposit rates accordingly. Id.  Commerce did not refer to a specific statute in its analysis, but its calculation of new tentative

CVD rates demonstrates an analysis of whether a subsidy existed pursuant to 19 U.S.C. § 1677(5).

See id.

However, after receiving additional factual information, Commerce reversed its position

in the Final Results. Commerce concluded that, pursuant to 19 U.S.C. § 1675(b)(1) and 19 C.F.R.

§ 351.216, "changed circumstances warranting a cash deposit adjustment [did] not exist," due

largely to changes in the record. Final Results at 27,989; IDM at 4, 12. Commerce further

determined that "the issue of whether a financial contribution exists under the current

circumstances [was] now moot." IDM at 18. Commerce did not explicitly state which statute it

was interpreting in conducting this analysis, but the lack of discussion of countervailability in the

Final Results reflects its decision to forego an analysis under 19 U.S.C. § 1677(5).

The court concludes that Commerce did not err in revising its initial decision that changed

circumstances exist because: (1) the statute, while silent as the substantive analysis required by

Commerce in a CCR, requires changed circumstances to exist in order for Commerce to alter the

cash deposit rate; and (2) neither the CCR Initiation nor the Preliminary Results were final agency

decisions. First, the lack of statutory guidance regarding Commerce's CCR analysis and process

means Commerce's interpretation of the statute is subject to Chevron deference. See Chevron,

U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984). The court finds persuasive the

reasoning in Marsan Gida, which noted that "the statute authorizing Commerce to conduct a

changed circumstances review, 19 U.S.C. § 1675(b)(1), does not explicitly define what a CCR is

or what a CCR entails." 35 CIT at 228; cf. Or. Steel Mills Inc., 862 F.2d at 1544 (noting that 19

U.S.C. § 1675(b) "sets out no specific conditions for setting aside an extant . . . affirmative

determination" in the changed circumstances review of an AD order). In Marsan Gida, the court

reasoned that Commerce has discretion to construe the breadth of its CCRs because statutory

silence expressly delegates authority to the agency to "elucidate a specific provision of the statute by regulation." 35 CIT at 228 (quoting Chevron, 467 U.S. at 843–44). The court noted that it must "defer to Commerce's reasonable interpretation of the antidumping and countervailing duty statute" and that Commerce's interpretation "need not be the only reasonable interpretation or even the most reasonable interpretation." Id. at 230 (citations omitted).

The Government explains that, at each stage of its investigation, Commerce interpreted 19 U.S.C. § 1675(b) to require "the existence of changed circumstances . . . be demonstrated, not merely to initiate the CCR, but to revise the final determination from the CVD investigation." Def.'s Resp. to Oral Arg. Questions at 3. The Government correctly notes that the statute also requires that "the party seeking revocation of an order or finding . . . shall have the burden of persuasion with respect to whether there are changed circumstances sufficient to warrant such revocation." See id. at 3–4 (citing 19 U.S.C. § 1675(b)(3)(A)). This language demonstrates that changed circumstances must be found at each stage of a CCR, a decision that Commerce is free to revise until the results of its investigation are final. Contrary to Plaintiffs' claims, this conclusion does not render the statute's requirement that Commerce "conduct a review," 19 U.S.C. § 1675(b)(1), meaningless, but rather appropriately affords Commerce the discretion to review the entirety of a situation when conducting a CCR. See Pls.' Resp. to Oral Arg. Questions at 3.

In sum, as set forth by the Government, Commerce conducts a two-step review at each stage of the CCR process. See Def.'s Br. at 9. Commerce first determines whether changed circumstances sufficient to warrant a review exist pursuant to 19 U.S.C. § 1675, and then, if such circumstances are present, whether the program in question is still countervailable or an adjustment is warranted. See id. This is evident in the Final Results, where Commerce concluded that there were "insufficient changed circumstances" and, as a result, expressly declined to "revisit issues

concerning the existence of a financial contribution."  IDM at 12.  The court concludes that Commerce's interpretation of the statutory framework was reasonable and in accordance with law.

Second, preliminary determinations such as the CCR Initiation and Preliminary Results are not final.  See, e.g., NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995) ("Preliminary determinations are 'preliminary' precisely because they are subject to change").  The court has specifically held that initiation decisions are preliminary and not final agency determinations.  See, e.g., Tokyo Kikai Seisakusho v. United States, 29 CIT 1280, 1286, 403 F. Supp. 2d 1287, 1293 (2005) ("Commerce's initiation of the changed circumstances review is a preliminary agency action."); see also Gov't of People's Republic of China v. United States, 31 CIT 451, 458, 483 F. Supp. 2d 1274, 1280 (2007) (holding that Commerce's initiation of a CVD investigation is not a final agency decision reviewable by the court).  As such, Commerce may change its stance on issues decided preliminarily in its final determinations, so long as it explains the reasoning for the change and "its decision is supported by substantial evidence and in accordance with law." Hyundai Steel v. United States, 42 CIT __, __, 319 F. Supp. 3d 1327, 1343 (2018) (citing Timken Co. v. United States, 23 CIT 509, 515, 59 F. Supp. 2d 1371, 1376 (1999)). Commerce therefore acted in accordance with law in deciding to revisit its initial determination that changed circumstances existed in the Final Results.

Plaintiffs' argument that Commerce incorrectly applied the CCR statute, rather than the CVD statute, characterizes the CCR statute too narrowly.  Plaintiffs unpersuasively contend that this case presents an issue of first impression under the CCR statutory provision: whether Commerce may return to its initiation decision in the Final Results.  Pls.' Resp. to Oral Arg. Questions at 1–2.  However, as explained above, this question was addressed by the court's decision in Marsan Gida, which the court finds persuasive in this case.  Plaintiffs argue that the

context of <u>Marsan Gida</u>, referring to a successor-in-interest analysis, differs meaningfully from the present case, and insist that a substantive analysis pursuant to 19 U.S.C. § 1677(5) is required. Pls.' Resp. to Oral Arg. Questions at 2–3.  However, the court finds that this argument does not overcome the preliminary nature of the <u>CCR Initiation</u> and <u>Preliminary Determination</u>, and the broad discretion afforded to Commerce in conducting CCRs.

The court concludes that Commerce's <u>Final Results</u> were in accordance with law because Commerce reasonably interpreted the statute to require changed circumstances at every stage of its CCR, and because the <u>CCR Initiation</u> and <u>Preliminary Results</u> were preliminary rather than final decisions that Commerce was entitled to revisit.

## II.   *Commerce's <u>Final Results</u> were Supported by Substantial Evidence.*

Plaintiffs next challenge Commerce's <u>Final Results</u> as not supported by substantial evidence because they claim that: (1) Commerce ignored evidence that undermined its determination; and (2) Commerce otherwise based its decision on speculation rather than record evidence.

As Commerce explained, during the underlying CVD investigation it examined soybean export restraints that benefited the biodiesel industry in Argentina through a program "designed and structured to entrust and direct soybean producers to provide Argentine biodiesel producers with soybeans for LTAR."  <u>Preliminary Results</u>, 84 Fed. Reg. at 32,717–18.  The GOA, in its request for initiation of a CCR, indicated changes in its soybean subsidy program and "attached three legislative decrees effecting changes across its export tax regime, including changes to the export taxes applied to soybeans, soybean oil, soymeal, and biodiesel."  <u>CCR Initiation</u>, 83 Fed. Reg. at 56,301.  The GOA also submitted information showing that Argentina's export tax on soybeans had been reduced from its rate of roughly twenty-seven to thirty percent during the CVD

investigation to only eighteen percent.  Id.  Meanwhile, Argentina's export tax on biodiesel had increased from zero percent to fifteen percent, "reducing the export tax differential from approximately [thirty] percent to [three] percent."  Id.  In addition, the GOA pointed out that "there [had] been no shipments which could be the subject of an administrative review" since the CVD investigation.  Id. at 56,302.  Based on this information, Commerce preliminarily concluded that changed circumstances warranting a change to the cash deposit rates existed and initiated a CCR.  Id. at 56,302.  In its Preliminary Results, Commerce cited the GOA's changes "to the export tax on soybeans as well as to the export taxes on downstream products (including biodiesel)" to preliminarily determine that the countervailable LTAR program no longer existed.  84 Fed. Reg. at 32,718.  Commerce also explained that it considered the "export tax on biodiesel in relation to the export tax on soybeans" and found the convergence between the two tax rates to demonstrate that the tax regime was no longer "benefitting or encouraging the development of the domestic biodiesel industry."  Id. at 32,718–19.

However, based on additional evidence placed on the record after the Preliminary Results, Commerce reversed this conclusion in the Final Results.  By the time the Final Results were issued, Commerce instead found that "there [were] no longer clear cut and discrete changes to examine." IDM at 5.  Commerce relied on evidence that since 2016, the tax regime had changed at least seven times: (1) calling for a monthly reduction of the tax on soybeans by half a percent; (2) increasing the tax on biodiesel to eight percent; (3) increasing the tax on biodiesel to fifteen percent; (4) reducing the tax on soybeans to eighteen percent and imposing temporary taxes on soybeans and biodiesel; (5) setting the taxes on soybeans and biodiesel at thirty and twenty-seven percent respectively; (6) giving the administration authority to set taxes up to thirty-three percent on soybeans and biodiesel; and (7) setting the taxes on soybeans and biodiesel at thirty-three and

thirty percent respectively.  Id. at 5–6.  The last of these changes was included in Decree 230/2020, added to the record in March 2020, which also stated that "it [was] essential to establish inclusive policies for the export activity of regional economies that improve their performance and increase the competitiveness of the export of goods and services as their added value increases."  Id. at 6.

Commerce also found that the new GOA administration showed "signs of resorting once again to the use of differential export taxes as a development tool for specific industries, and potentially abandoning the policy of neutrality underlying the initiation of this CCR."  Id. Commerce noted that a draft version of a bill enacted in 2019 stated that export taxes would be "reduced for goods whose production implies a greater added value from the inputs used and the National Executive Power [would] develop stimulus policies for the producer."  Id.  Commerce also cited a platform development document from the Justicialist Party, a member of the coalition supporting President Fernandez, proposing to increase soybean production and adopt policies promoting the development of exports and products associated with soybeans that added value. Id.  Commerce concluded that the "evidence cited . . . demonstrates a renewed interest in developing value added industries and soybean derivatives in particular."  Id. at 7.

Thus, in the Final Results, Commerce ultimately concluded that changed circumstances warranting a change to the cash deposit rates did not exist.  Specifically, Commerce found that "Argentina's export tax regime [was] in flux, leading Commerce to conclude that there [were] not sufficient changed circumstances to warrant such an adjustment.  Therefore, Commerce [made] no changes to the cash deposit rates as listed in the order."  Final Results, 85 Fed. Reg. at 27,989. Commerce noted that in the past, it had adjusted cash deposit rates outside of administrative reviews when the alleged changes were "clear cut and discrete, and the effect on the cash deposit rate was likewise straightforward."  IDM at 5.  Commerce found that "there [were] no longer clear

cut and discrete changes to examine" based on the seven times since the underlying CVD investigation in 2016 that Argentina's export tax regime had changed. Id. at 4–6. In order to avoid "speculative and incomplete results," Commerce determined that the GOA had not "demonstrated sufficient changes to warrant a revision to the cash deposit rates." Id. at 7–8.

   For the reasons stated below, the court holds that Commerce supported its Final Results with substantial record evidence. First, case law establishes that it was within Commerce's discretion to reconsider its analysis of evidence between the preliminary and final determinations. Second, the court concludes that Commerce's Final Results were not based on speculation.

### A.    *Commerce Lawfully Weighed the Record Evidence and Supported its Final Results with Substantial Evidence.*

   In arguing that the Final Results of the CCR were not supported by substantial evidence, Plaintiffs emphasize that the original CVD rate was set due to the export tax differential between soybeans and biodiesel, not the individual export taxes for these two goods. Pls.' Reply Br. at 8. Plaintiffs argue that Commerce relied on the export duty differential between soybeans and biodiesel in its original CVD investigation and in the Preliminary Results but changed its focus to the individual export taxes in its Final Results without providing any explanation for this change. Id. at 7–8. Plaintiffs claim that Commerce ignored the fact that the export tax differential between soybeans and biodiesel remained constant at three percent throughout the CCR period, and thus did not account for evidence that detracted from its conclusion. Pls.' Br. at 14–15 (citing 19 U.S.C. § 1516a(b)(1)(B)(i); Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)). Plaintiffs further argue that the consistent export tax differential establishes changed circumstances and no other evidence on the record can sufficiently support Commerce's conclusion in the Final Results that changed circumstances did not exist. Id. at 15, 20

While the Government acknowledges that the export tax differential between soybeans and biodiesel remained at three percent throughout the review, it responds that Commerce did not rely solely on this evidence to conclude that there were no changed circumstances sufficient to allow Commerce to determine the prospective subsidization rate for biodiesel.  Def.'s Br. at 16 (citing IDM at 5, 12).  Rather, the Government explains that Commerce initiated the CCR based on the GOA's "assertion that there was a straightforward and 'dramatic' change to the export tax regime," that were not proven during the review.  Def.'s Br. at 16; see also Def.-Inter.'s Br. at 14–15.  The Government characterizes the actual changes to the GOA administration's export tax regime as "concrete fluctuations" and asserts that relying on a regime "subject to such continual and rapid change" would have amounted to speculation by Commerce as to the precise changed circumstances.  Def.'s Resp. to Oral Arg. Questions at 9–10; see also Def.-Inter.'s Br. at 14–15.  NBB similarly explains that the GOA's multiple revisions to its export duty regime led Commerce to reasonably conclude that a subsidy analysis would be futile.  Def.-Inter.'s Br. at 4, 24–25.  Finally, the Government emphasizes that preliminary determinations are subject to change and that Commerce may change its views based on briefing, arguments, or additional record evidence in making final determinations.  Def.'s Br. at 11–12.

The court holds that the Final Results were supported by substantial evidence.  As an initial matter, Plaintiffs are incorrect in stating that Commerce did not address the export tax differential in its analysis of the evidence.  Commerce acknowledged that "the GOA is correct that the three percent differential has been maintained for approximately a year and a half," but, nevertheless, noted that there is no Argentine "statutory requirement that a three percent differential be maintained" and explained that it had concluded that "more changes [were] likely and that such changes might implement the GOA's stated goal of encouraging value added industries, such as

biodiesel." IDM at 12. Furthermore, Commerce cited to additional factual evidence on the record, including information regarding biodiesel prices, the biodiesel market, a new decree setting Argentine export taxes on soybeans and biodiesel at thirty and twenty-seven percent, respectively, and a second new decree setting Argentine export taxes on soybeans and biodiesel at thirty-three and thirty percent, respectively. IDM at 5–6. These facts reasonably support Commerce's conclusion that, despite the temporarily consistent export tax differential, there were no changed circumstances indicating that the LTAR program no longer existed. Thus, Commerce's change in position was explained and based on substantial evidence in light of the additional information placed on the record after the <u>Preliminary Results</u>.[4] <u>See</u> <u>Hyundai Steel</u>, 319 F. Supp. 3d at 1343 (citing <u>Timken Co.</u>, 23 CIT at 515, 59 F. Supp. 2d at 1376).

      Plaintiffs rely too heavily on the export tax differential between soybeans and biodiesel. While the consistent export tax differential between soybeans and biodiesel may detract from Commerce's final negative CCR determination, the numerous changes to Argentina's export tax regime and the draft bill stating that export duties would be reduced for goods that added value through their production detract from a conclusion that the countervailable subsidies found in the underlying investigation were no longer in place. <u>See</u> IDM at 6. Plaintiffs' assertion amounts to a "mere disagreement" with Commerce's conclusion and weight of the evidence rather than an assertion that Commerce's conclusion was not based on substantial evidence. <u>Haixing Jingmei</u>, 335 F. Supp. 3d at 1346. Therefore, the court concludes that Commerce adequately explained its

---

[4] The court notes that even where the record does not change between the preliminary and final determinations, Commerce may change its analysis of the same factual record evidence before the final determinations. <u>E.g.</u>, <u>Husteel Co. v. United States</u>, 39 CIT __, __, 98 F. Supp. 3d 1315, 1357 (2015) ("<u>Husteel</u>") (holding that Commerce may "reverse course on [an] issue in the Final Determination without having received any new evidence following the Preliminary Determination."). Specifically, "Commerce [is] not prohibited from reconsidering its analysis of the evidence." <u>Id.</u>

decision, including by addressing its weighing of the evidence regarding the export tax differential, and based its decision on substantial record evidence.

### B.   Commerce's *Final Results* Were Not Based on Speculation.

Plaintiffs also contend that Commerce's Final Results were based on impermissible speculation rather than substantial evidence. Pls.' Br. at 18–21. Plaintiffs characterize the Final Results as based on Commerce's mere speculation that Argentina's export duties could be subject to change based on a rejected draft version of Argentine legislation and a political party platform document. Id. at 20. Plaintiffs further note that the draft language Commerce relied upon was "rejected and deleted" from the final bill. Pls.' Resp. to Oral Arg. Questions at 14.

The Government and NBB argue that Commerce's determination was based on substantial record evidence, including evidence placed on the record after the Preliminary Results were issued, rather than mere speculation. Def.-Inter.'s Br. at 13; Def.'s Br. at 17–19. The Government and NBB contend that, instead, Commerce found that Argentina issued seven decrees altering its export tax regime since the original investigation, and that certain of those decrees were set to expire. Def.'s Br. at 10, 18; Def.-Inter.'s Br. at 14–17. At the time that the Preliminary Results were issued, Commerce found that Argentina had submitted an economic reform proposal to the IMF, corroborating the GOA's claims that it had shifted the focus of its export tax regime from selective economic development to general revenue collection and economic stability. 84 Fed. Reg. at 32,716. However, as NBB notes, after the Preliminary Results were issued, Argentina elected a new president whose administration began "unraveling" these changes and intended to renegotiate the IMF deal. Def.-Inter.'s Br. at 12, 24; Mem. from M. Hoadley to File re New Factual Information Attach. 1 (Dec. 17, 2019), P.R. 108. NBB notes that in the past, Commerce has refrained from changing cash deposit rates or re-analyzing countervailability except under

extremely narrow circumstances where it has found "clear cut and discrete" changes to subsidy programs. Def.-Inter.'s Br. at 22 (quoting IDM at 7).  NBB claims that Commerce acted in line with its past practice here by not finding clear cut and discrete changed circumstances sufficient to warrant a change in the cash deposit rates for biodiesel from Argentina.  Id. at 22–23.

The court concludes that Commerce's Final Results were supported by substantial evidence and not based on speculation.  First, the court acknowledges that there are limits to Commerce's discretion in evaluating record evidence -- namely, Commerce may not base its conclusions on speculation.  OSI Pharm., LLC v. Apotex Inc., 939 F.3d 1375, 1382–83 (Fed. Cir. 2019) (citing Intell. Ventures I LLC v. Motorola Mobility LLC, 870 F.3d 1320, 1331 (Fed. Cir. 2017)); see also Maverick Tube Corp. v. United States, No. 14-00229, 2016 CIT LEXIS 17, at *8 (Feb. 22, 2016); Wash. Int'l Ins. Co. v. United States, 33 CIT 1023, 1027 n. 6, 1036–38 (2009).  However, the court concludes that Commerce's Final Results were not based on mere speculation.

Although Commerce based its conclusions in part on predictions about Argentina's export tax regime in the immediate future, these predictions were based on trends established by substantial record evidence and existing circumstances.  Commerce specifically made note of seven completed changes to Argentina's tax regime that affected the export taxes on soybeans and biodiesel.  IDM at 5–6.  Commerce also cited a platform development document and draft bill from the Justicialist Party that supported its conclusion.  IDM at 6.  Commerce's Final Results did not reflect anticipated future changes to Argentina's export tax regime, rather, Commerce assessed the state of Argentina's export tax regime at the time of the Final Results.[5]  This is not mere

---

[5] Plaintiffs point out that CVD law includes a prospective method for setting cash deposit rates and a retrospective method for assessing duties, arguing that the purpose of a CCR is to reset the cash deposit rate and later assess final duty rates based on actual imports.  Pls.' Br. at 18–19 (citing Sioux Honey, 672 F.3d at 1047).  Plaintiffs claim that the dual prospective and retrospective

speculation as Plaintiffs contend.  The Government correctly notes that Commerce has no

obligation to change cash deposit rates at the conclusion of a CCR and provide prospective relief

to Plaintiffs, even while acknowledging Plaintiffs' claims about ceased shipments of biodiesel that

would have precluded a change to the CVD Order through administrative review.  Def.'s Br. at 9.

Rather, Plaintiffs carry the burden of persuasion "with respect to whether changed circumstances

sufficient to warrant" revocation of a CVD order exist.  See 19 U.S.C. § 1675(b)(3)(A).  That

Plaintiffs failed to carry that burden throughout the investigation does not mean that Commerce's

decision was based on speculation alone.

In short, the court concludes that Commerce's <u>Final Results</u> were based on substantial

evidence and not mere speculation.

### III.     *Plaintiffs Failed to Exhaust Administrative Remedies Regarding Timeliness.*

Pursuant to 19 C.F.R. § 351.216(e), Commerce must issue the final results of a CCR within

270 days of initiation.  However, due to various delays, Commerce issued its final determination

546 days after initiating this CCR.  See <u>CCR Initiation</u>; <u>Final Results</u>.  Plaintiffs challenge

Commerce's <u>Final Results</u> as untimely.  Pls.' Br. at 15–18.  The Government and NBB argue that

the court should not consider Plaintiffs' timeliness argument, because Plaintiffs failed to raise this

issue at the administrative level and exhaust their administrative remedies.  Def.'s Br. at 20; Def.-

Inter.'s Br. at 25.  The Government further observes that in September 2019, after the tolling period

caused by the Government shutdown and after Commerce had issued a case-specific hold on

deadlines, there were significant outstanding issues to resolve in the CCR.  Def.'s Br. at 20.  As

---

systems show Congressional intent for a CCR to capture only changes that have already occurred
at the time of the review.  <u>Id.</u> at 18.  Because the court finds that Commerce supported its
conclusion with substantial record evidence and assessed the state of the Argentine export tax
regime at the time of its <u>Final Results,</u> the court need not address this contention.

such, the Government argues that Plaintiffs had "ample notice" that Commerce would issue its

Final Results after the 270-day deadline.  Def.'s Br. at 20.

        Under 28 U.S.C. § 2637(d), a party must present "all arguments . . . relevant to the . . . final

[determination]" directly to Commerce before bringing those challenges to the court.  Four narrow

exceptions exist to relieve a party from this exhaustion requirement, where: "(1) plaintiff's

argument involves a pure question of law; (2) there is a lack of timely access to the confidential

record; (3) a judicial decision rendered subsequent to the administrative determination materially

affected the issue; or (4) raising the issue at the administrative level would have been futile."

Gerber Food (Yunnan) Co. v. United States, 33 CIT 186, 193, 601 F. Supp. 3d 1370, 1377 (2009)

(citation omitted).

        As they acknowledge, Plaintiffs failed to raise timeliness in their briefs of September 2019

or at any time between September 2019 and May 2020, when Commerce issued its Final Results.[6]

See Case Br. of the Gov't of Argentina (Sept. 17, 2019), P.R. 89; Rebuttal Br. of the Gov't of

Argentina in the CVD Changed Circumstances Review (Sept. 23, 2019), P.R. 93; Pls.' Reply Br.

at 12–13.  Plaintiffs argue that the futility exception applies such that the court should not require

exhaustion of this argument, as they could only have raised the issue after the deadline had already

passed.  Pls.' Reply Br. at 13.  Plaintiffs also note that timeliness is not within the scope of 28

U.S.C. § 2637(d), because it is not a substantive issue that would affect the CCR.  Id. at 12–13.

---

[6] Plaintiffs later assert that they "raised the issue [of timeliness] with Commerce five months before
the final results were issued," citing a memorandum placed on the factual record.  Pl. and Consol-
Pl.'s Joint Post-Arg. Submission at 4.  However, the cited memorandum only states that
Argentina's Ambassador to the United States "asked . . . where the decision-making process stood
and . . . when a determination would be made."  Mem. from A. Rankin to File re Telephone call
with Ambassador Fernando Oris de Roa to discuss Changed Circumstances Reviews (CCR) of
Biodiesel from Argentina 1 (Dec. 5, 2019), P.R. 104.  There is no mention of the regulatory
deadline, potential prejudice to any party, or even an outright objection to the delays.  The court
finds this memorandum insufficient to constitute exhaustion of administrative remedies.

However, the futility exception is narrow.  Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007).  Pursuant to 28 U.S.C. § 2637(d), the court must, "where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. 2637(d); see also Corus Staal, 502 F.3d at 1379.  "Although the statutory injunction is not absolute, it indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies."  Id.  "The mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust administrative remedies."  Id.

The court concludes that Plaintiffs failed to exhaust administrative remedies regarding timeliness.  Commerce granted an extension to the briefing deadlines to the parties, so that briefs were due just one day before the regulatory deadline for the CCR results.  Mem. from M. Hoadley to All Interested Parties re Changed Circs. Reviews of the Antidumping and Countervailing Duty Orders on Biodiesel from Argentina: Deadline for Case and Rebuttal Brs. And Hr'g Requests; Rejection of New Factual Information (Sept. 12, 2019), P.R. 85.  Commerce also scheduled and held a hearing on September 26, 2019, just after the deadline would have passed.  Def.'s Br. at 4.  Plaintiffs thus had sufficient opportunity to raise their concerns regarding timeliness, both in their briefs before the deadline and during the hearing after the deadline.  At both times, it was clear that Commerce would not meet the 270-day deadline so that it would not have been futile for Plaintiffs to attempt to raise this issue so that Commerce could have at least addressed this point prior to Plaintiffs bringing this challenge.  The court also declines to apply the narrow futility exception to this issue.[7]

---

[7] Indeed, Plaintiffs do not request that the court vacate Commerce's Final Results due to the delay.

In sum, given the notice that Plaintiffs had regarding the delayed issuance of the <u>Final Results</u> and their failure to address timeliness before Commerce, the court concludes that Plaintiffs failed to exhaust their administrative remedies on this issue and therefore declines to address it.[8]

### CONCLUSION

For the foregoing reasons, the court sustains Commerce's <u>Final Results</u> and denies Plaintiffs' motion for judgment on the agency record.

**SO ORDERED.**

/s/   Gary S. Katzmann
Gary S. Katzmann, Judge

Dated: <u>September 21, 2021</u>
          New York, New York

---

[8] Even if Plaintiffs had raised their concerns regarding timeliness at the administrative level, the court notes that Commerce's delayed issuance of the <u>Final Results</u> was a harmless error.  Statutory deadlines, much less the regulatory deadline in this case, are not mandatory in the absence of an express statement of consequences from Congress.  <u>See Jiangsu Zhongji Lamination Materials Co., (HK) v. United States</u>, 43 CIT __, __, 396 F. Supp. 3d 1334, 1335 (2019).  Furthermore, Commerce has discretion to modify deadlines so long as the modification does not substantially prejudice a complaining party.  <u>Am. Farm Lines v. Black Ball Freight Serv.</u>, 397 U.S. 532, 539 (1970).  Plaintiffs argue that the delayed results negatively affected the shipments and economy of LDC and the GOA, respectively, and furthermore that Commerce used the additional time to collect information that it ultimately used to rule against Plaintiffs.  Pls.' Resp. to Oral Arg. Questions at 16, 18.  However, the examples Plaintiffs provide presume a positive outcome in the CCR.  The GOA also agreed to a "short extension" only twelve days before the 270-day deadline of September 24, 2019.  IDM at 3.  The lack of substantial prejudice disposes of the timeliness issue under the harmless error rule.